Appeal Nos. 23-35322, 23-35323, 23-35324, 23-35354

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILD FISH CONSERVANCY,

*Plaintiff-Appellee/Cross-Appellant*,

vs.

JENNIFER QUAN, in her official capacity as the Regional Administrator for the National Marine Fisheries Service, *et al.*,

*Defendants-Appellants/Cross-Appellees*,

and

STATE OF ALASKA and ALASKA TROLLERS ASSOCIATION,

*Intervenor-Defendants-Appellants/Cross-Appellees*.

On Appeal from the United States District Court for the Western District of Washington Case No. 2:20-cv-00417-RAJ-MLP

## PLAINTIFF-APPELLEE/CROSS-APPELLANT'S REPLY IN SUPPORT OF MOTION FOR INJUNCTION PENDING APPEAL

Brian A. Knutsen
Emma A. O. Bruden
Kampmeier & Knutsen, PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
Tel: (503) 841-6515
brian@kampmeierknutsen.com
emma@kampmeierknutsen.com

Eric A. Lindberg
Corr Cronin, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
Tel: (206) 625-8600
elindberg@corrcronin.com

*Attorneys for Plaintiff-Appellee/Cross-Appellant Wild Fish Conservancy*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................... ii

GLOSSARY OF ACRONYMS ..................................................................... iv

I. INTRODUCTION .................................................................................1

II. ARGUMENT .........................................................................................2

    A. The Conservancy Is Likely to Succeed in Its Appeal. ...........................2

    B. The Requested Relief Is Needed to Avoid Irreparable Injury .............10

    C. The Equities and Public Interests Favor the Requested Relief ...........11

III. CONCLUSION ....................................................................................12

CERTIFICATE OF COMPLIANCE ...............................................................14

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*All. for the Wild Rockies v. Cottrell*,
 632 F.3d 1127 (9th Cir. 2011) .................................................................... 12

*California v. Block*,
 690 F.2d 753 (9th Cir. 1989) ........................................................................ 3

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
 36 F.4th 850 (9th Cir. 2022) ................................................................ *passim*

*High Sierra Hikers Ass'n v. Blackwell*,
 390 F.3d 630 (9th Cir. 2004) ...................................................................... 11

*Lands Council v. McNair*,
 537 F.3d 981 (9th Cir. 2008) ........................................................................ 2

*Marbled Murrelet v. Babbitt*,
 83 F.3d 1068 (9th Cir. 1996) ...................................................................... 12

*Metcalf v. Daley*,
 214 F.3d 1135 (9th Cir. 2000) .............................................................. 1, 4, 5

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
 886 F.3d 803 (9th Cir. 2018) ........................................................... 10, 11, 12

*Sierra Club v. Marsh*,
 872 F.2d 497 (1st Cir. 1989) .................................................................. 4, 11

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
 985 F.3d 1032 (D.C. Cir. 2021) ................................................................... 1

## Regulations

40 C.F.R. § 1500.1 ................................................................................1, 3

40 C.F.R. § 1502.14 ......................................................................................3

50 C.F.R. § 402.14 ........................................................................................8

## Other Authorities

Federal Rule of Appellate Procedure 8 ........................................................8

# GLOSSARY OF ACRONYMS

| | |
|---|---|
| BiOp | Biological Opinion |
| ESA | Endangered Species Act |
| HSRG | Hatchery Science Review Group |
| ITS | Incidental Take Statement |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| pHOS | Proportion of Hatchery Origin Spawners |
| SEAK | Southeast Alaska |
| SRKW | Southern Resident Killer Whale |
| WFC_ER | Wild Fish Conservancy's Excerpts of Record, filed with Plaintiff-Appellee/Cross-Appellant's Motion for Injunction Pending Appeal |
| WFC_SER | Wild Fish Conservancy's Supplemental Excerpts of Record, filed with Plaintiff-Appellee/Cross-Appellant's Response to Intervenor-Defendant-Appellant State of Alaska's Motion for Stay Pending Appeal |

Plaintiff Wild Fish Conservancy ("Conservancy") respectfully submits this reply in support of its Motion for an Injunction Pending Appeal ("Conservancy's Motion").

I.  **INTRODUCTION.**

It contravenes the National Environmental Policy Act ("NEPA") to allow the National Marine Fisheries Service ("NMFS") to implement the prey increase program while the agency supposedly evaluates whether to adopt that program or an alternative that would not undermine recovery of threatened salmon. NEPA "does not set out substantive environmental standards, but instead establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences" **before** actions are taken. *See Metcalf v. Daley*, 214 F.3d 1135, 1141–42 (9th Cir. 2000); 40 C.F.R. § 1500.1(b), (c).[1] This Court "characterized the statute as 'primarily procedural,' and held that 'agency action taken without observance of the procedure required by law will be set aside.'" *Metcalf*, 214 F.3d at 1141. The District Court's refusal to vacate the program, **adopted without any required NEPA procedures**, "would 'vitiate' the statute." *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021). An injunction is needed to halt the bureaucratic momentum

---

[1] Citations to NEPA regulations are to the 2019 Code of Federal Regulations that was in place when the challenged decisions were made.

1

behind the program and ensure NMFS's ongoing NEPA process provides a "meaningful assessment of reasonable alternatives" and is not used "as a subterfuge designed to rationalize a decision already made." *See Env't Def. Ctr. v. Bureau of Ocean Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022).

Contrary to NMFS's conclusory assertions, the data show the program is jeopardizing the survival and recovery of threatened Chinook salmon, which undermines recovery of Southern Resident Killer Whales ("SRKW") dependent on those fish as prey. The Conservancy's Motion should be granted to ensure the continued survival of these species as required under the Endangered Species Act ("ESA").

**II.   ARGUMENT.**

**A.   The Conservancy Is Likely to Succeed in Its Appeal.**

The District Court abused its discretion in declining to vacate portions of NMFS's biological opinion for Southeast Alaska salmon fisheries ("SEAK BiOp") that pertain to the prey increase program. Specifically, it misunderstood applicable standards and relied on erroneous findings. *See Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008).

Initially, the Court should reject NMFS's invitation to ignore controlling precedent and replace standards for vacating unlawful action under the Administrative Procedure Act with traditional injunctive relief standards. *See*

Federal Defendants' Opposition to Conservancy's Motion ("NMFS's Response") 9–11; Conservancy's Reply to Federal Defendants' Response Supporting Alaska's Motion for Stay Pending Appeal 3–4.

The Court misunderstood NEPA in finding that NMFS could remedy its errors by offering better reasoning for its unlawful adoption of the program. *See* WFC_ER46–47. The alternatives analysis is "the heart" of NEPA because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form," allowing informed agency decision-making and public participation. *See* 40 C.F.R. §§ 1500.1(b), (c), 1502.14. NMFS adopted the prey increase program without considering alternatives or public input, undermining those central objectives. *See California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). The District Court's decision to leave an action in place suffering from such deficiencies was inconsistent with precedent. *See* Conservancy's Motion 17–18.

NMFS argues its errors are procedural and that remand without vacatur allows it to "provide further explanation" for the program. NMFS's Response 12 n.3. This admits that NMFS intends to use remand as "a subterfuge designed to rationalize a decision already made," contravening NEPA. *See Env't Def. Ctr.*, 36 F.4th at 882.

NEPA seeks to prevent environmental harm resulting from uninformed decision-making; such injuries become more difficult to avoid as an agency

3

becomes more committed to a project: "Each" "event[] [towards implementation] represents a link in a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues" "even if new, or more thorough, NEPA statements are prepared and the agency is told to 'redecide.'" *Sierra Club v. Marsh*, 872 F.2d 497, 500–01 (1st Cir. 1989) (citation omitted). Courts "should take account of the potentially irreparable nature of this decisionmaking risk to the environment when considering a request for preliminary [relief]." *Id.* at 501.

These concerns were recognized in *Metcalf*, where NMFS agreed to support a whaling quota for a Tribe and began implementing the agreement before NEPA efforts. 214 F.3d at 1137–40. This Court held that NMFS violated NEPA by committing to the whaling quota before completing NEPA review. *Id.* at 1143–44. Further, "[i]t [was] highly likely that because of the Federal Defendants' prior written commitment to the [Tribe]" "the [NEPA document] was slanted in favor of finding that the [Tribe's] whaling proposal would not significantly affect the environment." *Id.* at 1144. The Court therefore "suspend[ed] implementation of the Agreement with the Tribe" and ordered a new NEPA process "done under circumstances that ensure an objective evaluation free of the previous taint." *Id.* at 1146; *see also Env't Def. Ctr.*, 36 F.4th at 882 (vacating NEPA document and enjoining further approvals "until the agencies have issued an [environmental

4

impact statement] and have fully and fairly evaluated all reasonable alternatives").

The District Court misunderstood these principles when it relied on NMFS's intent to offer better reasoning for the program on remand as support for leaving the program in place. *See* WCF_ER46–47. NMFS's insistence that the program will continue and that it will merely "provide further explanation" for its illegal adoption of the program demonstrates that remand without vacatur is insufficient— any NEPA process will be "slanted in favor" of rationalizing its prior unlawful decision. *See* NMFS's Response 12 n.3; *Metcalf*, 214 F.3d at 1144. The injunction is needed to ensure that NMFS's NEPA process, ongoing now, provides "an objective evaluation free of the previous taint." *See Metcalf*, 214 F.3d at 1146.

The District Court relied on erroneous factual findings, including a failure to appreciate that vacatur of the incidental take statement ("ITS") negated any supposed need for the program. *See* Conservancy's Motion 14. NMFS points out that vacating the program would not impact SRKW prey this season, it would affect prey beginning in 2026. NMFS's Response 14. That misses the point. Vacatur of the ITS will provide the rapid increase in prey needed by SRKWs and that relief will remain in place until NMFS completes a new BiOp for the fisheries, which will presumably account for the status of the prey increase program.

NMFS argues Dr. Lacy overestimated the benefit of vacating the ITS because, according to NMFS, the fisheries reduce prey by 0.5% in coastal waters

5

during the winter when the whales are "generally" present and 1.8% in inland waters during the summer when the whales are "generally" present. NMFS's Response 13. That greatly underestimates the fisheries' impact. While the SRKWs were historically "more often" in certain areas at certain times, they are highly mobile year-round, and it is inappropriate to ignore prey reductions in areas within the whales' range simply because they were present there less often than other areas. *See* WFC_ER520–22, 682. Further, the historical patterns are changing because of reduced prey, with SRKWs spending significantly less time in inland waters and more time in coastal waters where the fisheries cause greater prey reductions: an average prey reduction of 5% and a high of 12.9%. *See* WFC_ER680–682; WFC_SER242–43. By comparison, NMFS predicted the prey increase program would increase prey by 4%–5%, which it called "meaningful," if releasing 20 million smolts annually; however, the federal program is releasing less than half of that. *See* WFC_ER442–43, 120. The District Court correctly found that vacating the ITS meaningfully improves prey, as it almost certainly provides more benefit than the prey increase program. *See* WFC_ER39.

  The District Court made erroneous findings as to the status of the program and the impact of vacating it by including in its estimate of hatchery releases separate efforts by Washington State under a different program. *See* Conservancy's Motion 14–15. NMFS disingenuously argues that the District Court "did not

attribute state-funded releases to NMFS." NMFS's Response 14. NMFS's filings suggest it intended to conflate these separate programs, and the District Court's order indicates that NMFS was successful. *See* WFC_ER41 (describing only federal efforts and stating that "more than 19 million juvenile Chinook salmon [were] released"). Regardless, the program is releasing less than half of the smolts intended and relief here would not affect whether Washington continues its efforts.

The District Court erroneously found that harm to threatened salmon from the program "can conceivably be mitigated." *See* Conservancy's Motion 15–16. Dr. Luikart detailed how the program "will appreciably contribute to the inability of numerous wild Chinook salmon populations" "to recover" "and will also reduce the likelihood of their continued survival." WFC_ER240–42, 248–49, 253–55, 258–59; *see also* WFC_ER, 166–68.

NMFS continues to ignore precedent and insist that harm from hatchery releases "are best addressed at the site-specific level." *See* NMFS's Response 15. "Site-specific review cannot cure a failure to consult at the programmatic level, and incremental-step consultation is inadequate to comply with the ESA[;]" "[w]ere it otherwise, 'a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest.'" *Env't Def. Ctr.*, 36 F.4th at 891 (citations omitted).

Moreover, NMFS is not conducting site-specific reviews for each increase,

but is largely relying on reviews that pre-date and do not analyze the program. Conservancy's Motion 15–16. For example, a 2007 BiOp did not evaluate the current status of threatened salmonids in 2019 when the program was adopted, as required under the ESA. *See* WFC_ER125; 50 C.F.R. § 402.14(g)(2), (4). NMFS's representation that there has been "no new information" warranting updated analysis is not credible. *See* NMFS's Response 15–16. For example, NMFS is relying on a 2007 BiOp that addressed Lower and Middle Columba River hatcheries as support for increasing production now, but a 2017 BiOp found that significant reductions in releases are needed to protect Lower Columbia River Chinook salmon. *See* WFC_ER122, 125, 353–57.

NMFS asks the Court to ignore Dr. Gayeski's declaration because it was not submitted to the District Court. NMFS's Response 16 n.4. Federal Rule of Appellate Procedure 8(a)(2)(B) explicitly allows the Court to consider, in addition to "relevant parts of the record," "sworn statements supporting facts subject to dispute." Irrespective of whether these opinions may be considered in assessing the likelihood of success on appeal, they may be considered when evaluating irreparable injury.

Moreover, Dr. Gayeski merely connected the dots for materials in the record. Dr. Luikart explained that the metric "pHOS"—proportion of hatchery-origin fish on spawning grounds—is used to measure harm from genetic interactions between

8

wild and hatchery salmon. WFC_ER246–50. Dr. Luikart explained that pHOS levels for Chinook salmon populations affected by the program already greatly exceed thresholds set by the Congressionally-chartered Hatchery Science Review Group ("HSRG"); e.g., while the HSRG recommends pHOS not exceed 5% or 10% depending on the wild population, Lower Columbia River Chinook salmon populations exceed those thresholds. WFC_ER162–64, 245–50. Dr. Luikart found that "these high pHOS levels are likely contributing to the low productivity of the natural populations" and that the program will likely "further inhibit the prospects for the continued survival, much less the recovery," of Chinook salmon. WFC_ER167. NMFS generically criticized that conclusion but never said whether current pHOS levels are acceptable or will be exacerbated by the program. *See, e.g.*, WFC_ER100 (claiming "[o]ptimal pHOS will depend on multiple factors").

NMFS's Mitchell Act BiOp imposed "take" limits using pHOS as a surrogate, setting pHOS limits of 10%, 30%, and 50% for different affected populations, to ensure the continued survival of Lower Columbia River Chinook salmon. See WFC_ER365. Dr. Luikart's analysis showed that those pHOS "take" limits are already being exceeded. *See* WFC_ER163–64. Yet, NMFS's program is increasing releases at Lower Columbia River hatcheries—including the Umatilla, Bonneville, Little White/Willard, and Spring Creek hatcheries—that will exacerbate already unacceptable pHOS levels as explained by Dr. Luikart. *See*

9

WFC_ER114–15. Dr. Gayeski summarized this information, contained in the record, that shows the program is funding hatcheries that already violate pHOS "take" limits and that increased production will cause more severe violations. Contrary to NMFS's conclusory statements, the data show that the program threatens extirpation of salmon populations and jeopardizes the continued survival and recovery of threatened Chinook salmon.

The Conservancy is likely to prevail because the District Court abused its discretion in declining to vacate the program given the violations at issue and the consequences of continuing the program while NMFS remedies its errors.

**B. The Requested Relief Is Needed to Avoid Irreparable Injury.**

NMFS misrepresents precedent in claiming that injury "at the species level" is needed for an injunction under the ESA. *See* NMFS's Response 17. The opinion NMFS cites states the opposite:

> The ESA accomplishes its purpose in incremental steps, which include protecting the remaining members of a species. Harm to those members is irreparable because once a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult.

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018) (citations and quotations omitted).

The Conservancy has shown that the program will cause irreparable injury. As described in the Conservancy's Motion and above, the program is not only

10

harming individuals, it is threatening the survival and recovery of threatened Chinook salmon species, thereby also undermining recovery of SRKWs. That plainly constitutes irreparable injury warranting an injunction under the ESA. *See id.* NMFS adopted the program without any required NEPA procedures, and its continued implementation while it supposedly evaluates whether to adopt the program precludes a meaningful NEPA process. That constitutes irreparable injury supporting an injunction under NEPA. *See Marsh*, 872 F.2d at 499–504; *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004).

NMFS argues that the Conservancy failed to show harm to its members. NMFS's Response 18. The Conservancy established that its members have interests in salmon that are harmed by the program. *See generally* WFC_ER194–206, 207–21. That is plainly sufficient. *See Nat'l Wildlife Fed'n*, 886 F.3d at 822 (finding irreparable injury where members have an interest in salmon and NMFS's actions would lead to fewer salmon).

## C. The Equities and Public Interests Favor the Requested Relief.

NMFS makes unsupported and vague arguments, for the first time on appeal, that vacating the program would frustrate some undefined framework for managing fisheries and recovery efforts. NMFS's Response 19. The Court should reject these unsubstantiated arguments. These assertions highlight that NMFS is committed to implementing the program and that, absent an injunction, its current

11

NEPA process will be a "subterfuge designed to rationalize a decision already [unlawfully] made. *See Env't Def. Ctr.*, 36 F.4th at 882.

The public interests do not support continuing the illegal program, as a federal subsidy for commercial overfishing, while NMFS evaluates the program under the ESA and NEPA. Instead, the equities "sharply" favor relief that ensures the program does not jeopardize survival and recovery of threatened Chinook salmon and the SRKWs that depend on those salmon. *See Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996); *Nat'l Wildlife Fed'n*, 886 F.3d at 817. Public interests also favor suspending the program until the "careful consideration of environmental impacts" required by NEPA occurs. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011).

### III. CONCLUSION.

The Conservancy respectfully requests the Court issue the requested injunction.

//

//

//

Respectfully submitted this 15th day of June 2023.

| KAMPMEIER & KNUTSEN, PLLC | CORR CRONIN, LLP |
|---|---|
| By: s/ Brian A. Knutsen<br>    Brian A. Knutsen, WSBA No. 38806<br>By: s/ Emma A. O. Bruden<br>    Emma A. O. Bruden, WSBA No. 56280<br>1300 S.E. Stark Street, Suite 202<br>Portland, Oregon 97214<br>Tel: (503) 841-6515 (Knutsen)<br>    (503) 719-5641 (Bruden)<br>Email: brian@kampmeierknutsen.com<br>    emma@kampmeierknutsen.com | Eric A. Lindberg, WSBA No. 43596<br>1015 Second Avenue, Floor 10<br>Seattle, Washington 98104<br>Tel: (206) 625-8600<br>Email: elindberg@corrcronin.com |

Paul A. Kampmeier, WSBA No. 31560
705 Second Avenue, Suite 901
Seattle Washington 98104
Tel: (206) 858-6983
Email: paul@kampmeierknutsen.com

*Attorneys for Plaintiff Wild Fish Conservancy*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this reply brief complies with the requirements of Federal Rules of Appellate Procedures 27(d)(1) and 32(a)(5) and (a)(6) because it has been prepared in 14-point Times New Roman font, a proportionally spaced font.

I further certify that this reply brief complies with Federal Rule of Appellate Procedure 27(d)(2)(C) because it contains 2,594 words, according to the count of Microsoft Word.

DATED this 15th day of June 2023.

                                       s/ Brian A. Knutsen
                                      Brian A. Knutsen, WSBA No. 38806
                                      *Attorney for Plaintiff-Appellee/Cross-Appellant*