**Nos. 23-35322, 23-35323, 23-35324, 23-35354**

United States Court of Appeals for the Ninth Circuit
_____

JENNIFER QUAN, in her official capacity as Regional Administrator of the
National Marine Fisheries Service; JANET COIT, in her official capacity as the
Assistant Administrator for Fisheries of the National Marine Fisheries Service;
NATIONAL MARINE FISHERIES SERVICE; GINA M. RAIMONDO, in her
official capacity as Secretary of the United States Department of Commerce;
UNITED STATES DEPARTMENT OF COMMERCE,
*Appellants-Defendants*,

THE STATE OF ALASKA,
*Appellant-Intervenor*,

THE ALASKA TROLLERS ASSOCIATION,
*Appellant-Intervenor*,

v.

WILD FISH CONSERVANCY, a Washington non-profit corporation,
*Cross-Appellant-Plaintiff*,
_____

Appeal from U.S. District Court, Western District of Washington, Seattle
Honorable Richard A. Jones
No. C-20-417-RAJ

**OPENING BRIEF OF APPELLANT-INTERVENOR STATE OF ALASKA**

TREG TAYLOR
ATTORNEY GENERAL
STATE OF ALASKA

Laura Wolff
Assistant Attorney General
1031 West Fourth Ave., Suite 200
Anchorage, Alaska 99501
(907) 269-6612 (phone)
laura.wolff@alaska.gov
*Attorney for Appellant-Intervenor*
*State of Alaska*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................4

JURISIDICTIONAL STATEMENT ..................................................7

INTRODUCTION ............................................................................7

ISSUES PRESENTED FOR REVIEW ..............................................10

STATEMENT OF THE CASE ..........................................................10

  I.    FACTUAL BACKGROUND ....................................................10

      A.  Southeast Alaska depends on the Chinook troll fishery. ......................10

      B.  Southern Resident killer whales are listed under the Endangered Species Act, as are some stocks of Chinook salmon. ...........................15

  II.   STATUTORY FRAMEWORK ..................................................18

      A.  The Magnuson-Stevens Act .......................................18

      B.  The Pacific Salmon Treaty .........................................20

      C.  The Endangered Species Act........................................22

      D.  The National Environmental Policy Act .............................23

      E.  The Administrative Procedure Act....................................23

  III.  PROCEEDINGS BELOW ......................................................24

      A.  NMFS's 2019 Biological Opinion shielded the Southeast Alaska salmon fishery from ESA liability. ......................................24

      B.  In 2020, the Wild Fish Conservancy sued NMFS................................27

      C.  In 2023, the district court vacated part of the 2019 BiOp, effectively enjoining the Southeast Alaska troll fishery. ........................28

SUMMARY OF THE ARGUMENT ..................................................31

STANDARD OF REVIEW ..............................................................32

ARGUMENT ................................................................................33

  I.    Courts consider two factors when deciding whether to vacate an unlawful agency action and put no thumb on the scale of vacatur. ...........................33

  II.   The equities warranted remand without vacatur........................................35

A. Shutting down Southeast Alaska's Chinook troll fishery is a certain death knell to rural Southeast Alaska communities. ............................35

B. Shutting down Southeast Alaska's Chinook troll fishery would provide no meaningful benefit to the SRKW ......................................................39

C. Shutting down Southeast Alaska's Chinook troll fishery is not in the nation's interest. ....................................................................................46

III. The agency will likely issue the same ITS on remand, which also favors remand without vacatur. ...............................................................................48

CONCLUSION .......................................................................................................54

# TABLE OF AUTHORITIES

## Cases

*350 Montana v. Haaland*,
  50 F.4th 1254 (9th Cir. 2022) ......................................................34

*All. for the Wild Rockies v. United States Forest Serv.*,
  907 F.3d 1105 (9th Cir. 2018) ....................................................34

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ....................................................33

*Cal. Cmtys. Against Toxics v. E.P.A.*,
  688 F.3d 989 (9th Cir. 2012) ........................................... 33, 39, 48

*Ctr. for Biological Diversity v. Bernhardt*,
  982 F.3d 723 (9th Cir. 2020) ......................................................27

*Ctr. for Food Safety v. Regan*,
  56 F.4th 648 (9th Cir. 2022) ..................... 33, 34, 35, 38, 45, 47, 48, 51, 52

*Est. of Diaz v. City of Anaheim*,
  840 F.3d 592 (9th Cir. 2016) ......................................................33

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
  572 U.S. 559 (2014) ..................................................................32

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ..................................................................34

*Nat'l Family Farm Coalition v. EPA*,
  966 F.3d 893 (9th Cir. 2020) ........................................... 39, 48, 51

*Pit River Tribe v. U.S. Forest Serv.*,
  615 F.3d 1069 (9th Cir. 2010) ....................................................32

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,
  898 F.2d 1410 (9th Cir. 1990) ....................................................29

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ..................................................................23

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ......................................................24

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
  438 F.3d 937 (9th Cir. 2006) ......................................................19

*United States v. Texas*,
    143 S. Ct. 1964 (2023) ................................................................34

*United States v. Washington*,
    853 F.3d 946 (9th Cir. 2017) .....................................................38

## Constitutional Provisions

Alaska Const. art VIII, § 4 ...........................................................19

## Federal Statutes

5 U.S.C. § 701 ...............................................................................7

5 U.S.C. § 702 .............................................................................23

5 U.S.C. § 706 .........................................................................7, 34

16 U.S.C. § 1532(19) ..................................................................22

16 U.S.C. § 1536(a)(2) ...............................................................21

16 U.S.C. § 1536(b)(4) ...............................................................22

16 U.S.C. § 1536(o)(2) ..........................................................22, 28

16 U.S.C. § 1540 ..............................................................7, 28, 29

16 U.S.C. § 1801 ...................................................................17, 18

16 U.S.C. § 1853 .........................................................................18

16 U.S.C. § 1854 .........................................................................18

16 U.S.C. § 1856 .........................................................................18

28 U.S.C. § 1291 ...........................................................................7

28 U.S.C. § 1331 ...........................................................................7

42 U.S.C. § 4332(C) ...................................................................23

43 U.S.C. § 1311 .........................................................................18

43 U.S.C. § 1312 .........................................................................18

Alaska Statehood Act, Pub. L. 85-805, 72 Stat. 339 (1958) ......19

Pacific Salmon Treaty Act, Pub. L. 99-5, 99 Stat. 7 (1985)......20

**Federal Regulations**

40 C.F.R., Part 1501 ................................................................23

50 C.F.R. § 402.14 ..................................................................22

50 C.F.R. § 222.102 ................................................................22

**Alaska Regulations**

5 Alaska Admin. Code § 39.222(c) ..........................................19

**Other Authorities**

Endangered and Threatened Wildlife and Plants: Endangered Status for Southern
Resident Killer Whales, 70 Fed. Reg. 69,903 (Nov. 18, 2005).....................15

Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Salmon,
77 Fed. Reg. 75,570 (Dec. 21, 2012)............................................18

## JURISIDICTIONAL STATEMENT

The Wild Fish Conservancy sued the National Marine Fisheries Service, alleging violations of the Endangered Species Act, the National Environmental Policy Act, and the Administrative Procedure Act. 8-ER-1845–74. The State of Alaska and the Alaska Trollers Association intervened. 4-ER-821–22; 8-ER-1803–04. The district court had jurisdiction to review the Conservancy's claims. 5 U.S.C. §§ 701–706; 16 U.S.C. § 1540(g); 28 U.S.C. § 1331. It entered a final judgment. 1-ER-2–3 All four parties timely appealed. 8-ER-1899–1921. This Court has jurisdiction to review the district court's decision. 28 U.S.C. § 1291.

## INTRODUCTION

This case is about the proper remedy when a court finds flaws in an agency's environmental analysis. Here, the district court's choice of remedy would effectively halt a critical Alaskan fishery—irreparably harming Southeast Alaskan communities—without providing a corresponding benefit to endangered species, only to have the agency reissue the same decision the following year.

In 2019, the National Marine Fisheries Service issued a Biological Opinion about Southeast Alaska fisheries. The opinion addressed the continued delegation of management of the Southeast Alaska salmon fishery to the State of Alaska, federal funding to the State to manage the fishery under the terms of the Pacific Salmon Treaty, and conservation programs for endangered Southern Resident

killer whales and some threatened Chinook salmon. The conservation programs are designed to offset impacts from numerous fisheries in Alaska and the Pacific Northwest. One of the conservation measures, the "prey increase program," produces additional hatchery fish to release into the wild to boost the amount of prey available for the endangered whales. In its Biological Opinion, the agency concluded that Alaska's fishery would not jeopardize the endangered whales and salmon, and issued an Incidental Take Statement for any incidental "take" of those species, for purposes of the Endangered Species Act.

In 2020, the Wild Fish Conservancy sued the agency to enjoin the Southeast Alaska fishery and the prey increase program. The district court found flaws in the agency's Biological Opinion and concluded that the agency should also have performed further environmental analysis under the National Environmental Policy Act. The court ordered briefing on the remedy. That is the focus of this appeal.

In remanding to the agency for further analysis, the district court partly vacated the Incidental Take Statement, which effectively enjoined the Southeast Alaska Chinook salmon troll fishery. It did so even though closing that fishery would have certainly spawned disaster for Southeast Alaska's economy and way of life while providing no meaningful benefit to the endangered whales. And it did so even though, by 2023 (when the district court entered its remedy order), the flaws

the district court found with the Biological Opinion had already been substantially remedied.

This Court stayed the district court's vacatur order because a flawed Incidental Take Statement need not be vacated upon remand and instead "may be left in place when equity demands." 2-ER-47–51. This Court found that the defendants and intervenors had shown "a sufficient likelihood" that "the certain and substantial impacts of the district court's vacatur on the Alaska salmon fishing industry outweigh the speculative environmental threats posed by remanding without vacatur." 2-ER-50. This Court was right. For the same reasons it granted the stay, this Court should now reverse the district court's vacatur order.

This is not a typical environmental law case. Environmental conservation organizations; local, tribal, and federal governments; and Congressional leaders have banded together to keep the Southeast Alaska fishery open. *See* Congressional Delegation and Tribal Coalition amici briefs and attachments thereto, ECF Nos. 22 & 42. SalmonState, an organization whose goal is ensuring access to sustainable wild salmon, said it best: the Conservancy's litigation is "misguided [and] irresponsible," an "abuse of the Endangered Species Act," and "in all probability won't save a single endangered killer whale, but will ruin the livelihoods of thousands of Alaska's most committed, long-term conservationists

and wild salmon allies."[1] *See also* Appx. to Cong'l Del. Amici Br. at 95–96, ECF No. 22-3 (May 23, 2023 Letter from four conservation groups—SalmonState, Southeast Alaska Conservation Council, Sitka Conservation Society, and Alaska Rainforest Defenders—denouncing the Conservancy's suit).

## ISSUES PRESENTED FOR REVIEW

1. *Equities:* Given the certain devastation that vacatur would have caused Southeast Alaska and the speculative environmental benefit of vacatur to the whales, did equity demand remand to the agency without vacatur?

2. *Seriousness of errors:* Given that the prey increase program was no longer uncertain and unspecific and that the agency completed Endangered Species Act and National Environmental Policy Act analyses for each hatchery within the program, were the agency's errors serious enough to require vacatur?

## STATEMENT OF THE CASE

### I. FACTUAL BACKGROUND

#### A. Southeast Alaska depends on the Chinook troll fishery.

Troll fishing for Chinook salmon is critical to Southeast Alaska's economy, local governments, and culture. Trollers fish by hook and line, handling each

---

[1] SalmonState condemns Wild Fish Conservancy's fatally flawed approach to environmentalism and judge's decision on Alaska's troll fishery, SalmonState.org (last visited September 25, 2023), https://salmonstate.org/press-releases/salmonstate-condemns-wild-fish-conservancys-fatally-flawed-approach-to-environmentalism-and-judges-decision-on-alaskas-troll-fishery.

individual fish with care. 8-ER-1807. Trollers are advocates for sustainable wild salmon and ally with conservation groups to protect and restore wild salmon. Appx. to Cong'l Del. Amici Br. at 95–96, ECF No. 22-3 (May 23, 2023 Letter from four conservation groups in support of trollers). This is because trollers' livelihoods depend on healthy salmon runs. 3-ER-544–45.

The Chinook troll fishery is crucial to the broader Southeast Alaska troll fishery. Depending on the year, Chinook amounts to between one third and one half of the troll fleet's "ex vessel" earnings (i.e., how much trollers are paid for their catch). 2-ER-229. While trollers fish for Coho and chum salmon in addition to Chinook salmon, troll-caught Chinook fetch by far the highest value per pound. 3-ER-514; *see also* Exh. to Tribal Amici Br., ECF No. 42-3 at 19 (Dybdahl Decl. ¶7). Chinook also grow much larger than Coho or chum. 3-ER-514; *see also* Exh. to Tribal Amici Br., ECF No. 42-3 at 19 (Dybdahl Decl. ¶7). This means that catching one Chinook could equal the value of catching five Coho. And this matters because, as discussed above, trollers catch one fish at a time. 8-ER-1807. For many trollers, not being able to fish for Chinook means it is not economically viable to troll fish at all. 2-ER-229; *see also* Exh. to Tribal Amici Br., ECF No. 42-3, at 13, 19, 27 (Douville, Dybdahl, and Marks Decls.). While this appeal concerns the district court's order effectively closing the summer and winter Chinook troll

seasons, the order implicated the viability of the entire Southeast Alaska troll fishery as well.

The total annual economic output of the Chinook commercial troll fleet for the winter and summer seasons is approximately $29 million. 3-ER-519–21. This includes how much trollers are paid for their catch (i.e., the "ex vessel" value) plus wages and the secondary spending that circulates in Southeast Alaska as the fishermen purchase goods and services, which keeps the local communities afloat. 3-ER-517–19. The average annual "ex-vessel" value of the Chinook troll fishery for the summer and winter seasons is about $10.4 million. 3-ER-518, 521.

The troll fishery supports jobs for over one thousand people. 3-ER-519–20; 2-ER-228–29; Appx. to Cong'l Del. Amici Br., Dkt. 22-3 at 52 (2023 Alaska Legislature Resolution). As for direct employment, over 1,000 people hold active troll fishing permits in Southeast Alaska. 3-ER-517. Additionally, many trollers employ deckhands. 3-ER-519; *see also* Exh. to Tribal Amici Br., ECF No. 42-3, at 34 (Peterson Decl.).

Fish processing plants—which contribute significantly to Alaska's economy—also rely on the troll fishery. 3-ER-519. Even more so during the winter, when the troll fishery provides the only source of fish. 2-ER-231.

The State of Alaska and local governments rely on trollers for much-needed tax revenue. This includes corporate income taxes and motor oil tax for the State,

and municipal taxes for local governments. 2-ER-231. It also includes fish landing taxes. 2-ER-231. Half of those landing taxes goes to the State's general fund and the other half goes to the respective municipality or unorganized boroughs where the landing occurs, which, in turn, pays for schools, utilities, harbor maintenance, and other needed services. 2-ER-231.

Troll fishing supports small Southeast Alaska communities where the fishery is *the* economy, as well as larger communities where the fishery is a significant contributor to the economy. For small towns like Pelican, about a third of its population participates directly in the troll fishery. 3-ER-524. The fishery further supports the local economy because trollers pay moorage, buy ice, refuel, and visit the local café. 3-ER-524. Community members work at the local processing plant, which operates to process the trollers' catch. 3-ER-524–25. And raw fish taxes account for ten percent of the town's entire annual local revenue, which pays for education, water, wastewater, electricity, snowplowing, trash, and boardwalk repairs. 3-ER-524.

Troll fishing is also critical to larger towns like Sitka. Although only seven percent of the households there are associated with troll permits, the troll fishery nonetheless brings in over eight million "ex-vessel" dollars per year, a huge number for a town with only 8,000 residents. 2-ER-230–32. This "ex vessel" value does not account for the additional benefit created by secondary spending as

fishermen purchase goods and services throughout the local community. 3-ER-519–20. And it does not account for the fish landing taxes, which support community infrastructure and basic services. 3-ER-519; 2-ER-230–31.

Troll fishing is a "way of life," passed down from one generation to the next. 8-ER-1812–13; 3-ER-543–47. It not only allows individuals to pay bills, but it is also critical for communities' "spiritual and physical wellbeing." 3-ER-547.

This cultural importance is especially significant for many Alaska Natives, including Tlingit and Haida people who have lived in Southeast Alaska since time immemorial, and Tsimshian people who migrated to the Annette Islands in the 1800s. Tribal Amici Br. and Exh., ECF Nos. 42-2, 42-3. These native people participate in the Southeast Alaska troll fishery and use each season to pass down intergenerational knowledge. Exh. to Tribal Amici Br., ECF No. 42-3, at 33 (Peterson Decl.). About 600 troll permits are held by members of federally recognized tribes. Exh. to Tribal Amici Br., ECF No. 42-3, at 34 (Peterson Decl.). Because troll fishing is one of the few industries that offers well-paying jobs in remote Southeast Alaska, it enables tribal members to continue living on their traditional lands and practicing their traditional way of life. Exh. to Tribal Amici Br., ECF No. 42-3, at 43 (Ware Decl.) Everything costs money: food, clothes, even fuel and gear to go subsistence fishing.

If this Court had not stayed the district court's vacatur order, the Chinook troll fishery in Southeast Alaska would have been effectively shut down in 2023. *See* 2-ER-49–51. Shutting down that fishery, even for just one season, would have meant economic, social, and cultural devastation.

## B. Southern Resident killer whales are listed under the Endangered Species Act, as are some stocks of Chinook salmon.

Southern Resident killer whales (SRKW) are a specific population of killer whales listed as endangered under the Endangered Species Act (ESA). Endangered and Threatened Wildlife and Plants: Endangered Status for Southern Resident Killer Whales, 70 Fed. Reg. 69,903 (Nov. 18, 2005). Their population is at a historic low, down from a peak of 97 in 1996 and slightly greater than their nadir of 67 in 1974, when their census began. 5-AR-962–63; 4-ER-607. Their decline was initially precipitated by their removal for public display in aquaria in the 1970's. 70 Fed. Reg. at 69,908. Their continued decline has been attributed to multiple factors including prey availability, toxins in their environment and food, and vessel noise and vessel traffic that disturbs use of echolocation to forage and communicate. *Id.*; 5-ER-968–76. The whales are typically found throughout the waters off Washington, Oregon, and Vancouver Island. 5-ER-968–76. And they typically live in inland waters in the summer and coastal waters in the winter. 5-ER-966–67, 1127. The preferred diet of these whales is mature Chinook salmon, though they do consume other species of salmon and other species of fish as

15

mature Chinook salmon are not present in sufficient numbers year round. 5-ER-969–70.

Chinook salmon hatch in freshwater and then migrate to the ocean where they mature for three to five years before returning to their birth waters to spawn and die. 5-ER-890. Some Chinook that originate in the Pacific Northwest migrate far north into the Gulf of Alaska and take advantage of the nutrient rich waters to feed and grow before returning to spawn in their natal streams. 5-ER-890; 2-ER-240. Not all mature salmon return to their spawning grounds (and to SRKW territory). 2-ER-242–43; 8-ER-1775–76

Before mature Chinook that spend time in the Gulf of Alaska can become prey for the SRKW, they have to migrate through a gauntlet of other predators and fisheries, and most don't make it. 2-ER-242–43; 8-ER-1779–80. Some are consumed by salmon sharks, pinnipeds, and other resident populations of killer whales. 2-ER-242–43; 8-ER-1779–80. Some are captured by commercial and recreational fisheries off the coasts of Southeast Alaska, British Columbia, and Washington. 2-ER-237, 243; 8-ER-1779–80, 1794–95.

Four threatened stocks of Chinook[2] are relevant to the Alaska fishery because the fishery incidentally takes a small number of these fish. 4-ER-858; 6-

---

[2] These are the Lower Columbia River Chinook, the Snake River Fall-run Chinook, the Upper Willamette River Chinook, and the Puget Sound Chinook. 4-ER-858.

16

ER-1205–06. The Alaska fishery is a mixed-stock fishery, meaning it harvests various stocks of Chinook—some originate from various areas within Alaska, some from Northern and Central British Columbia, some from Southern British Columbia, and some from the Pacific Northwest. 2-ER-241–42. These four listed stocks originate in the Pacific Northwest. 4-ER-858. The primary causes of decline for these listed Chinook stocks are loss of habitat, hydropower development, poor ocean conditions, overfishing, and poor hatchery practices. 5-ER-929, 935–36, 946, 957. Depending on how a hatchery operates, its effect on salmon can be positive, neutral, or negative. 5-ER-1106–07. NMFS uses hatcheries to preserve vital genetic resources for severely threatened stocks while other factors limiting survival and abundance are addressed. 5-ER-1106. Hatchery-produced salmon provide a "significant component of the salmon prey base returning to the watersheds within the range of SRKW." 5-ER-972. Hatchery-produced salmon also provide a significant component of the Southeast Alaska fishery's harvest. 2-ER-246.

## II.     STATUTORY FRAMEWORK

### A.   The Magnuson-Stevens Act

In 1976, in response to foreign competition for fish in the United States' exclusive economic zone,[3] Congress passed the Magnuson-Stevens Act. 16 U.S.C. § 1801, *et seq*. The Act establishes a national program for the management of federal fisheries to prevent overfishing; to promote optimal yields of the nation's fisheries; and to sustain the economic, employment, and food supply benefits derived from the nation's fisheries. 16 U.S.C. § 1801. Under the Act, the National Marine Fisheries Service (NMFS) implements Fishery Management Plans to regulate fishing between three and 200 miles from the coast. 16 U.S.C. §§ 1853, 1854. States maintain authority to regulate fishing in their territorial waters, which extend three miles from the coast.[4] 16 U.S.C. § 1856.

The Act placed the salmon fishery between three and 200 miles off the coast of Alaska under federal management. 2-ER-1402, 1407, 1415. Nevertheless, the early versions of federal Fishery Management Plan adopted most of the State of

[3]     Under international law, coastal nations have jurisdiction over resources in their exclusive economic zone (EEZ), which extends 200 nautical miles from a nation's coastline.

[4]     While the country's EEZ extends 200 miles off the coastline, states have "title to and ownership of" and the "right and power to manage" the natural resources located within three miles from their coastlines. 43 U.S.C. §§ 1311, 1312. The Magnuson-Stevens Act does not diminish a state's jurisdiction over resources in its waters. 16 U.S.C. § 1856.

Alaska's harvest restrictions and management measures. 6-ER-1408. And since 1990, NMFS's Fishery Management Plan has delegated management authority of commercial troll fishing in federal waters in Southeast Alaska to the State. 6-ER-1402, 1409. The agency reaffirmed that delegation in 2012. Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Salmon, 77 Fed. Reg. 75,570 (Dec. 21, 2012); 6-ER-1403.

The State has been managing its fisheries since statehood. 6-ER-1415; Alaska Statehood Act, Pub. L. 85-805, § 6(e), 72 Stat. 339, 340–41 (1958). It does so according to the "sustained yield" principle mandated by its constitution. Alaska Const. art VIII, § 4. The State manages "wild salmon stocks . . . at levels of resource productivity that assure sustained yields." 5 Alaska Admin. Code 39.222(c). The State manages the Southeast Alaska troll fishery in federal waters (which are subject to the Magnuson-Stevens Act) and state waters (which are not) as a single unit. 6-ER-1415; 7-ER-1441. Troll fishing for Chinook in winter (October through April) and spring (May through June) occurs exclusively in state waters, while the summer season (July through September) extends to federal waters as well. 7-ER-1441–42.

The judicial review provisions of the Magnuson-Stevens Act are narrow to ensure that Fishery Management Plans and amendments to them—such as the agency's delegation of management to Alaska—"are effectuated without

19

interruption and that challenges are resolved swiftly." *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 438 F.3d 937, 948 (9th Cir. 2006).

### B. The Pacific Salmon Treaty

Because salmon are highly migratory and salmon originating in Canada are intercepted in the United States and vice versa, the two countries signed the Pacific Salmon Treaty in 1985. 6-ER-1423. The Treaty is based on shared responsibility for conservation and rational management and provides a bilateral forum for cooperation and coordination of research, management, and enhancement. 6-ER-1423. The Treaty's goals are to prevent overfishing, provide for optimum production, and afford equitable benefit to each party from the production of salmon originating in its waters. 6-ER-1417, 1423. The parties renegotiate the fishing regimes every ten years to update conservation goals and harvest sharing arrangements. 5-ER-880–81.

Harvest limits and harvest exploitation rates are set by complex Treaty negotiations. 7-ER-1618–8-ER-1765. In addition to bilateral international agreement, changes to Treaty harvest regimes also require intranational agreement (i.e., consensus among the U.S. Commissioners, one of whom represents Alaska). Pacific Salmon Treaty Act, Pub. L. 99-5, §3(a),(g), 99 Stat. 7 (1985). Most Treaty fisheries are managed as Individual Stock-Based Management fisheries based on

exploitation rate impacts on specific constituent stocks, and have flexibility to increase or decrease their harvest depending on in-season abundance levels of those particular stocks. 8-ER-1794–95; 5-ER-895. The other three fisheries, including the Southeast Alaska fishery, are Aggregate Abundance-Based Management fisheries, and are managed to catch limits set before the season opens and only have flexibility to decrease their harvest depending on in-season abundance levels, but cannot exceed their catch limit. 8-ER-1794; 5-ER-891–92. According to Treaty negotiations, the catch limit for the entire Southeast Alaska fishery (not just the trollers) is set annually based on data from the early winter troll fishery. 7-ER-1676; 5-ER-892.

In the most recent Treaty negotiation, and in response to concerns for some Chinook stocks and SRKW, the parties reduced harvest limits for Aggregate Abundance-Based Management fisheries. 5-ER-887–88; 6-ER-1191. Alaska agreed to reduce its harvests of Chinook by up to 7.5%, and Canada agreed to reduce its harvest by 12.5%. 5-ER-895; 6-ER-1191. Other fisheries, notably those along the coasts of Southern British Columbia, Washington and Oregon—which operate in the waters SRKW inhabit—were largely left untouched by the Treaty. *See* 5-ER-1036–37; 3-ER-414, 442. The harvest limit reductions are the product of complex, multi-issue, multi-party political negotiation rather than a reflection of any fishery's proportional impact on the endangered whales.

## C.   The Endangered Species Act

The Endangered Species Act (ESA) requires federal agencies to ensure that any action they fund, authorize, or carry out is "not likely to jeopardize the continued existence of any endangered species or threatened species" or destroy or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2). If an agency action is "likely to adversely affect" any listed marine or anadromous species or their designated critical habitat, NMFS must issue a Biological Opinion (BiOp). 50 C.F.R. § 402.14. A BiOp analyzes whether the proposed action is likely not just to affect a species, but whether it is likely to jeopardize the continued existence of the species or result in the destruction or adverse modification of critical habitat. *Id.* If the agency determines that the proposed action will not have these jeopardizing effects, and that any incidental "taking" of the listed species will not jeopardize the species or destroy its critical habitat, the agency issues an Incidental Take Statement (ITS). 16 U.S.C. § 1536(b)(4). The statutory term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The regulatory definition of "harm" includes degrading habitat to such a degree that it "actually kills or injures" wildlife "by significantly impairing essential behavioral patterns, including, breeding, spawning, [. . . or] feeding." 50 C.F.R. § 222.102. Any take that complies with an ITS is shielded from liability under the ESA. 16 U.S.C. §

1536(o)(2). If a person knowingly "takes" a listed species without an ITS in place, the person is subject to criminal and civil penalties, and may be liable for litigation costs in citizen suits. 16 U.S.C. §§ 1540(a), 1540(b), 1540(g)(4).

### D. The National Environmental Policy Act

The National Environmental Policy Act (NEPA) is a procedural statute that requires federal agencies to evaluate the environmental consequences of proposed major federal actions that significantly affect the quality of the human environment. 42 U.S.C. § 4332(C). NEPA serves the dual purpose of informing agencies of the environmental effects of proposed federal actions and making relevant information available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Whether an agency prepares no NEPA analysis, a brief Environmental Assessment, or a more robust Environmental Impact Statement depends on whether it is taking a major federal action, whether the action is categorically exempt from NEPA, whether the significance of its impacts are unknown, and whether or not the action is found to have a significant environmental impact. *See* 40 C.F.R., Part 1501. The agency determines which category of NEPA assessment it conducts. *See id.*

### E. The Administrative Procedure Act

The Administrative Procedure Act (APA) affords judicial review to persons aggrieved by certain federal actions. 5 U.S.C. § 702. Because neither the ESA nor

NEPA supply a separate standard of review, the APA provides the legal framework for reviewing claims under those Acts, meaning courts analyze ESA and NEPA claims by considering whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

### III.   PROCEEDINGS BELOW

#### A.   NMFS's 2019 Biological Opinion shielded the Southeast Alaska salmon fishery from ESA liability.

In 2019, NMFS issued a Biological Opinion (2019 BiOp) considering the combined effects on ESA-listed species from the following federal actions: (1) the agency's ongoing delegation of salmon fisheries management in Southeast Alaska to the State, (2) federal funding to the State to manage the fisheries and meet the obligations under the Pacific Salmon Treaty, and (3) a conservation program for habitat improvement and hatchery production to benefit both critical stocks of Puget Sound Chinook salmon and SRKW. 5-ER-884–90.

Although the conservation program is described in the 2019 BiOp, which otherwise focuses on the Southeast Alaska fishery, the program is intended to offset impacts to the endangered whales and ESA-listed Puget Sound Chinook from *all* fisheries under the Pacific Salmon Treaty, not just the Alaska fishery. 5-ER-888–90; 6-ER-1193; 3-ER-324–25.

24

The conservation program has three components. 5-ER-888. The first two components aim to aid ESA-listed Puget Sound Chinook by continuing hatchery programs to conserve genetics for at-risk stocks and implementing habitat restoration programs. 5-ER-888. Puget Sound Chinook are one of the four stocks of Chinook relevant to Alaska's fishery because, as stated above, Alaska incidentally takes some of those fish. 5-ER-1014–21; 6-ER-1281–94. But in terms of quantity, the Alaska fishery takes very few Puget Sound salmon because these stocks have local migratory pattern and only occasionally stray as far as Alaska. 5-ER-890, 1014–21; 2-ER-243–44. These two components are mainly meant to mitigate for Canadian and Pacific Northwest fisheries' large impact on Puget Sound Chinook and habitat degradation in the Pacific Northwest. 2-ER-243–44; 5-ER-888–90, 1031, 1105. By increasing Puget Sound Chinook abundance, these two components of the conservation program would incidentally bolster prey availability for the endangered whales over the long term. 5-ER-888.

The third component of the conservation program is a hatchery initiative designed to increase Chinook availability specifically for SRKW. 5-ER-888–89. The 2019 BiOp explains how reduced prey availability "may cause [SRKW] to spend more time foraging than when prey is plentiful and increase the risk of poor body condition and nutritional stress." 6-ER-1194. The prey increase program

intends to increase prey availability to the endangered whales by 4 to 5 percent at a cost of $5.6 million annually. 5-ER-889; 6-ER-1194.

The 2019 BiOp analyzed whether, given these mitigation measures, the Southeast Alaska fishery was likely to jeopardize the endangered whales. The BiOp found that the entire fishery (i.e., sport, commercial seine and gillnet, subsistence, and troll) has historically reduced SRKW prey availability in inland waters from July through September by 0.1% to 2.5%, and in coastal waters from October through April by only 0.2 to 1.1%. 5-ER-1126–27; 6-ER-1192, 1194. The BiOp also reported historical data for the converse times and places: coastal waters in the summer and inland waters in the winter. 5-ER-1126–27. If time of year is taken out of the analysis, the BiOp calculates that the Southeast Alaska fishery reduces SRKW prey availability in coastal waters by an average of 5% and in inland waters by an average of 1%. 5-ER-1125. But the time and place breakdown of the fishery's impact on prey availability is relevant because the endangered whales typically live in inland waters in the summer and coastal waters in the winter. 5-ER-966–867; 6-ER-1191–92.

NMFS concluded that continued operation of the Southeast Alaska fishery, consistent with the Treaty-established limits and 2019 BiOp approved mitigation measures, was not likely to jeopardize the SRKW or the four relevant listed Chinook stock or adversely modify their critical habitat. 6-ER-1172–95. The BiOp

thus included an ITS for any incidental take of SRKW and the four ESA-listed Chinook consistent with the Treaty's limits. 6-ER-1205–06.

**B.    In 2020, the Wild Fish Conservancy sued NMFS.**

In 2020, the Wild Fish Conservancy sued NMFS, alleging NEPA, ESA, and APA violations. 8-ER-1845–74. The State of Alaska and the Alaska Trollers Association intervened. 4-ER-821–22; 8-ER-1803–04.

The parties cross-moved for summary judgment, and the trial court found in the Conservancy's favor. 4-ER-612–53.

First, the court concluded that the agency violated the ESA because its determination that the endangered whales would not be jeopardized relied on a mitigation program (the prey increase program) that was not yet fully funded and not yet site-specific. 4-ER-612–13, 638–47. Agencies may rely on mitigation measures in making no jeopardy determinations, but the mitigation must "describe, in detail, the action agency's plan" and be "reasonably certain to occur." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020).

Second, the court concluded that the 2019 BiOp was flawed because it did not consider how the new prey increase program would affect threatened Chinook stocks. 4-ER-612–13, 644–47. The court did not find any flaw in the BiOp's consideration of how the Southeast Alaska fishery itself impacts those stocks. *See generally* 4-ER-612–53. Rather, the flaw the district court found was the agency's

failure to analyze how the prey increase program might impact those stocks. 4-ER-612–13, 645–46.

Third, the court found that the agency's ITS should have triggered NEPA review. 4-ER-612–13, 647–50.

Finally, the court concluded that the prey increase program should have triggered NEPA review. 4-ER-612–13, 650–51.

### C.   In 2023, the district court vacated part of the 2019 BiOp, effectively enjoining the Southeast Alaska troll fishery.

The parties then briefed the appropriate remedy for these ESA and NEPA violations. 8-ER-1933. Because the Magnuson-Stevens Act barred directly enjoining NMFS from delegating fishery management to the State—one of the actions analyzed in the BiOp—the Conservancy instead sought to vacate the BiOp's ITS, which indirectly enjoined Alaska's fishery. 7-ER-1587, 1604; 4-ER-823; 8-ER-1933.

Vacating the ITS effectively enjoined Alaska's fishery because the ITS shields Alaska and trollers from ESA liability. 16 U.S.C. § 1536(o)(2). The ESA makes people civilly and criminally liable for knowingly "taking" a listed species without an ITS in place and subjects defendants to litigation costs. 16 U.S.C. § 1540. The ITS is critical for Alaska's fishery because it covers incidental take of the four relevant ESA-listed salmon—not just SRKW—and Alaska's trollers do incidentally take some ESA-listed salmon, albeit in limited numbers. 6-ER-1205.

Given the exceedingly expensive litigation costs, civil fines, and criminal penalties for each take, fishing is effectively enjoined if there is no ITS in place for ESA-listed salmon. 16 U.S.C. § 1540(a) (civil penalties), § 1540(b) (criminal violations), § 1540(g)(4) (fee shifting costs for citizen suits).[5]

In addition to asking the district court to vacate the ITS, the Conservancy also sought to enjoin the prey increase program, arguing that increased hatchery production would harm wild ESA-listed salmon. 1-ER-30.

The district court granted the Conservancy's request to vacate the ITS as applied to the summer and winter Chinook troll fishery. 1-ER-5, 44–45. The court asserted that there was a "presumption" that vacatur was the proper remedy, that courts deviate from vacatur in "rare" circumstances, and that the defendants did not overcome the presumption. 1-ER-4, 19, 29, 35.

---

[5]     Vacating the ITS for SRKW does not have quite the same injunctive effect. This is because it is questionable whether the Southeast Alaska fishery's minimal impact on prey availability is significant enough to constitute a "take" of SRKW under the ESA. *See Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1419–20 (9th Cir. 1990) (finding no "take" where evidence of any one year's water diversion did not actually cause the listed fish's spawning problems, especially given that other water users were also diverting water). NMFS appears to have included an ITS for the whales in the 2019 BiOp in an excess of caution to account for years of low salmon abundance and because NMFS lacked "data needed to establish quantitative relationship between prey availability" and "effects to SRKW." 6-ER-1206. The 2023–2024 fishing season is *not* projected to be a year of low Chinook abundance. 2-ER-60–61. Nevertheless, the litigation risks could still make fishing without an ITS for SRKW untenable.

The district court denied the Conservancy's request to enjoin the prey increase program. 1-ER-4, 35–38.

The State filed in the district court a motion to stay vacatur of the ITS pending appeal, which the Alaska Trollers Association joined, and which the federal defendants supported. 8-ER-1936. The Conservancy cross-moved for an injunction pending appeal of the prey increase program. 8-ER-1936. The district court denied both motions. 8-ER-1937.

The parties then asked this Court for the same relief. State's Motion to Stay, ECF No. 15; Conservancy's Cross-Motion for Injunction, ECF No. 19; ATA's Joinder to Motion to Stay, ECF No. 20; Fed'l Response Supporting Motion to Stay, ECF No. 21. The Alaska Congressional Delegation filed an amici brief supporting the State's requested stay, which included letters and resolutions from dozens of remote Southeast Alaska communities, tribes, and tribal organizations, discussing how important the Chinook troll fishery was to their communities and how disastrous its closure would be. Cong'l Amici Br., ECF No. 22. A coalition of Alaska tribes and tribal organizations also submitted an amici brief outlining the devastating and disproportionate impact the closure would have on indigenous communities of Southeast Alaska. Tribal Amici Br., ECF No. 42.

This Court stayed the district court's vacatur order, recognizing that a flawed agency action "need not be vacated upon remand and instead may be left in place

when equity demands." 2-ER-50. It concluded that "the moving parties have established a sufficient likelihood of demonstrating on appeal that the certain and substantial impacts of the district court's vacatur on the Alaska salmon fishing industry outweigh the speculative environmental threats posed by remanding without vacatur." 2-ER-50. This Court denied the Conservancy's motion to enjoin the prey increase program pending appeal. 2-ER-50–51.

## SUMMARY OF THE ARGUMENT

The district court abused its discretion in effectively enjoining the Southeast Alaska Chinook troll fishery by vacating the fishery's Incidental Take Statement.

First, the district court erred in putting a thumb on the scale of vacatur. When vacatur has the effect of an injunction, there can be no presumption of vacatur. Rather, the equities control.

Second, the district court erred in balancing the equities. Equity demanded remand without vacatur. The certain and substantial impacts of the district court's vacatur on the Alaska salmon fishing industry outweighed the speculative environmental threats posed by remanding without vacatur. The district court erred in undervaluing the cascading harms to Southeast Alaska from closing the fishery during remand. And the district court erred in finding that closing the fishery on remand would meaningfully benefit the endangered whales. The district court further erred in choosing a remedy that undermines international negotiations and

31

that conflicts with the purpose of the prey increase program. Congress funds the prey increase program to ensure *both* that the endangered whales get more prey and that the Alaska fishery (as well as other fisheries in the Pacific Northwest) can continue to operate.

Third, the district court erred because the agency is likely to issue the same ITS on remand, meaning that vacatur will be too short-lived to justify its destabilizing effects. By 2023, when the district court entered its vacatur order, the flaws the court had found in the 2019 BiOp had been substantially remedied. The court erred in ignoring this, and instead focusing on the errors in 2019. And despite the Conservancy's desire that NMFS, on remand, contravene international negotiations and lower Alaska's harvest levels in a BiOp, NMFS has neither the authority nor reason to do so. NMFS is likely to issue the same ITS on remand. Vacating the ITS in the meantime would have devastated Southeast Alaska while providing no meaningful benefit to the endangered whales.

## STANDARD OF REVIEW

This Court reviews a district court's decision to remand without vacatur for abuse of discretion. *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1080 (9th Cir. 2010). A district court abuses its discretion when its ruling is based on an erroneous view of the law or on a clearly erroneous findings of fact. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 564, n.2 (2014). Even when there

is no error of law or fact, a district court also abuses its discretion when this Court is "convinced firmly that the reviewed decision lies beyond the pale of reasonable justification under the circumstances." *Est. of Diaz v. City of Anaheim*, 840 F.3d 592, 601 (9th Cir. 2016).

## ARGUMENT

I. **Courts consider two factors when deciding whether to vacate an unlawful agency action and put no thumb on the scale of vacatur.**

This Court instructs that a two-factor test applies when determining whether an agency action should remain in effect on remand. *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022) (discussing Ninth Circuit's adoption of D.C. Circuit's test in *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). The test weighs the "seriousness of the agency's errors against the 'disruptive consequences of an interim change that may itself be changed.'" *Regan*, 56 F.4th at 663 (quoting *Allied-Signal*). One factor in this analysis—the "disruptive consequences" factor—gets at the equities. *Id.* at 668. Even when errors are substantive, the equities may nonetheless warrant remand without vacatur. *Cal. Cmtys. Against Toxics v. E.P.A.*, 688 F.3d 989, 993–94 (9th Cir. 2012). The other factor gets at whether the agency will likely institute the same rule on remand. *Regan*, 56 F.4th at 663–67. Both factors weighed in favor of remand without vacatur here, and the district court erred in concluding otherwise.

The district court also erred in constraining its decision because of a "presumption" of vacatur. 1-ER-4, 35. Although this Court has, on occasion, referred to vacatur as a "presumptive" remedy for APA violations, in practice, this Court refuses to reflexively apply any such presumption. *350 Montana v. Haaland*, 50 F.4th 1254, 1259, 1273 (9th Cir. 2022) (refusing to automatically vacate decision because there was "dearth of evidence concerning the impact of vacatur").[6] "A federal court is not required to set aside every unlawful agency action, and the decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity." *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (internal quotation marks omitted); *see also Regan*, 56 F.4th at 663. The district court erred by feeling compelled by a "presumption" of vacatur. 1-ER-4, 35.

Moreover, when vacatur has the practical effect of an injunction, like it does here, a court cannot rightly put a thumb on the scale favoring such relief. *See Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 156–58 (2010) (no presumption of injunctive relief for NEPA violation). This is not a case where the district court was deciding whether to vacate a new agency rule with novel

---

[6] In fact, whether § 706's "hold unlawful and set aside" language even means "vacate" is subject to current debate. *See United States v. Texas*, 143 S. Ct. 1964, 1981–85 (2023) (Gorsuch, J., concurring) (opining that the APA's phrase "set aside" is not tantamount to "vacate" and that ordinary remedies apply under the APA instead).

prospective effect—the district court was deciding whether to effectively enjoin local fishermen who have been troll fishing their entire lives. The district court erred in applying a presumption favoring such drastic injunctive relief. 1-ER-4, 35.

## II. The equities warranted remand without vacatur.

This Court "leave[s] invalid agency action in place when equity [so] demands." *Regan*, 56 F.4th at 663 (internal quotation marks omitted). Equity so demanded here. Shutting down Southeast Alaska's Chinook troll fishery would do little for endangered whales while causing catastrophic and irreparable harm to Southeast Alaska. The district court erred in undervaluing the cascading harms to Southeast Alaska from closing the fishery. 1-ER-4, 35. It erred in finding that shutting down Alaska's fishery would provide meaningful benefit to the SRKW. 1-ER-4, 34. And it erred in concluding that any benefit to the whale—no matter how small or speculative—outweighed the concrete, severe, and devastating harm to Southeast Alaska communities. 1-ER-4, 34–35.

### A. Shutting down Southeast Alaska's Chinook troll fishery is a certain death knell to rural Southeast Alaska communities.

The record before the district court established that halting the Southeast Alaska Chinook troll fishery for even just a single season would create both immediate and long-lasting economic, social, and cultural harms. The district court erred in discounting this largely undisputed evidence.

The economic output of the Chinook summer and winter troll fishery is huge—about $29 million each year. 3-ER-519–21. The effects of shuttering it would be felt most acutely in smaller, remote communities, where the troll fishery is the primary industry and where secondary businesses have sprung up to support that fishery. 2-ER-230; 3-ER-523–25. The effects would also be felt in larger towns like Sitka, where just the "ex vessel" value of the fishery brings in millions of dollars. 2-ER-230.

Enjoining the troll fishery hurts more than just the fishermen because money generated from the fishery circulates throughout local communities through secondary spending. 3-ER-519–20. When trollers do not fish, the impacts cascade throughout the supply chain: they do not stop at stores to buy ice; purchase fuel at the dock; buy gear from local merchants; or sell their fish to local businesses who then smoke and sell it. 3-ER-519–21; *see also* Exh. to Tribal Amici Br., ECF No. 42-3, at 5 (Cook Sr. Decl.). The loss of the troll fishery would mean the loss of these secondary transactions.

It would also harm other secondary businesses such as fish processing plants. 3-ER-519. Because about a third of the value added in seafood processing is the cost of labor, decreasing the quantity of fish processed significantly decreases the need for (and wages to) laborers. 3-ER-519. If the winter fishery is closed,

processing plants could be forced to close too because the troll fishery is their only source of fish at that time. 2-ER-231.

Enjoining the fishery would harm the state and local governments by decreasing much-needed revenue from municipal taxes, corporate income taxes, motor oil taxes, and fish landing taxes. 3-ER-519; 2-ER-229, 231.

Shutting down the summer and winter seasons would reduce trollers' livelihoods by more than a third of the troll fleet's earnings. 2-ER-229. This might make it financially infeasible to troll fish at all. 2-ER-229; *see also* Exh. to Tribal Amici Br., ECF No. 42-3, at 19, 27 (Dybdahl & Marks Decls.). This is significant for more than 1,000 people who hold active troll fishing permits, and for the people who work for them. 3-ER-517, 519; *see also* Exh. to Tribal Amici Br., ECF No. 42-3, at 34 (Peterson Decl.).

Trollers cannot simply retrofit their boats for another fishery—Alaska's fishing is highly specialized and regulated, and investing in new gear and permits costs hundreds of thousands of dollars. 2-ER-232.

Nor can trollers just find other jobs. 2-ER-230. Troll fishing "is one of the few industries that offers well-paying jobs in remote Southeast Alaska." Tribal Amici Br., ECF No. 42-2, at 13. Shutting down the Chinook troll fishery would force families to choose between living without enough work or moving to find work. 2-ER-230. If families move, this could deprive remote communities of

enough school-age children to support their schools, leading to local school closures. 2-ER-230. And for tribal members, moving would mean leaving their traditional lands and their traditional way of life. Tribal Amici Br., ECF No. 42-2, at 13.

Vacatur would severely and irreparably harm the "way of life" for Southeast Alaska communities. 8-ER-1812–13; 3-ER-543–47; 2-ER-228–29. In vacating the ITS, the district court completely ignored the cultural and social harms of closing the fishery. *See* 1-ER-4–45. At oral argument, the magistrate judge doubted that those uncontested harms fit into its analysis. 2-ER-198–99. And neither the magistrate nor the district court mentioned the cultural and social harms in its orders. *See* 1-ER-4–45. Yet those impacts are relevant to the equities, so the court erred as a matter of law in ignoring them. *See United States v. Washington*, 853 F.3d 946, 961, 977 (9th Cir. 2017) (affirming that equitable considerations include "cultural and social harm" to communities "in addition to the economic harm"). The Alaska Trollers Association discussed these harms at length. *See, e.g.*, 2-ER-198–99 (oral argument citing to numerous declarations about such harms). And tribes and tribal organizations that would be significantly affected by vacatur of the ITS but that were not joined in this lawsuit, expounded on those cultural harms before this Court. Tribal Amici Br., ECF No. 42-2.

Even setting aside the social and cultural harms, the district court erred in concluding that the economic harms by themselves did not sufficiently weigh against vacatur. In comparable cases, when so many people's livelihoods are on the line, this Court has concluded that vacating an agency decision is unwarranted. *See, e.g.*, *Regan*, 56 F.4th at 668 (concluding that vacatur was unwarranted due, in part, to the disruption to the agricultural industry vacatur would cause); *Nat'l Family Farm Coalition v. EPA*, 966 F.3d 893, 929–30 (9th Cir. 2020) (remanding without vacatur because vacating approval of a pesticide that had been registered for five years could cause serious disruption to farmers); *Cal. Cmtys. Against Toxics*, 688 F.3d at 993–95 (concluding that vacatur was not warranted because, among other reasons, closing the power plant would "be economically disastrous" to a billion-dollar venture employing 350 workers). Likewise here, shutting down the Southeast Alaska Chinook troll fishery—even for just one season—would mean certain economic devastation. These undisputed facts weigh heavily against vacatur and the district court erred in undervaluing them.

### B. Shutting down Southeast Alaska's Chinook troll fishery would provide no meaningful benefit to the SRKW.

In contrast to the definite and lasting harm to Southeast Alaska, the benefits to SRKW from closing the fishery while NMFS reissues an ITS are speculative and, at best, minor. 2-ER-303–04. The district court did not make a finding regarding how much prey would ultimately reach the endangered whales if the

fishery were closed. *See generally* 2-ER-4–45. Instead, it acknowledged the "uncertainty as to how much prey would ultimately reach the SRKW." 1-ER, 4, 34. It erred in finding that "under any scenario" "closure of the fisheries [would] meaningfully improve[] prey availability to the SRKW, as well as SRKW population stability and growth." 1-ER-4, 34. Because the record does not support the finding that shuttering Alaska's fishery would provide meaningful improvement to the endangered whales, the court's finding is clear error.

The BiOp's analysis estimates that the increase in SRKW prey would be exceedingly small (less than 0.5% average in winter and less than 1.8% in summer in places where the whales typically are present during those times). 2-ER-304; 5-ER-1126–27; 6-ER-1192. And no one, not even the Conservancy's expert, opined that an increase of less than 2% prey availability while the BiOp is reissued would be "meaningful." *See* 4-ER-609–10 (Third Lacy Decl.)

The district court's finding of "meaningful" benefit to the SRKW rests on numerous flaws:

First, the district court appeared to credit the Conservancy's faulty graphic analysis. 1-ER-4, 34 (Report & Recommendation citing ¶11 of Lacy's Third Declaration to support finding that closing the fishery would be "meaningful"). The Conservancy's graph modeled what would happen *assuming* the entire Southeast Alaska fishery reduced prey availability for SRKW by 3%, 6%, 9%, or

12%, and chose 6% as "an approximate middle value" of a historical range of data from the 2019 BiOp. 4-ER-608–10. One problem with this graph is the *assumed* input numbers. Bad input assumptions lead to meaningless predictions. And the Conservancy's graph used unsupportable input numbers. Six percent is neither the mean nor the median of the range of historical estimates of prey reduction caused by the Alaska fishery. 2-ER-242; 5-ER-1126–27 (2019 BiOp's table of estimated historical impact).

The Conservancy's range is skewed too. By assuming that the Alaska fishery reduces prey availability by 3 to 12%, the Conservancy appeared to use data only from *coastal waters* during *the summer*. *Compare* 4-ER-610 (Lacy Third Decl.), *with* 5-ER-1126–27 (2019 BiOp's table of estimated historical impact). The historical impact of the entirety of Alaska's fishery on SRKW prey availability for all other times and locations is much less, always below 3.5%. 2-ER-242; 5-ER-1126–27. In fact, the Conservancy's expert even acknowledged the lower levels of impact on prey availability during non-summer seasons in coastal waters and during all seasons in inland waters. 8-ER-1835 (First Lacy Decl.). To that point, during the winter, when prey is less available and when increases or reductions of prey therefore matter most, Alaska reduces prey availability by a mere percentage of a single percent. 5-ER-970, 1032, 1126–27; 3-ER-340, 357. But in graphing Alaska's impact, the Conservancy ignored those numbers showing the fishery's

historical low impact because those numbers didn't fit its narrative, and instead used only the highest numbers it could find. 4-ER-610 (Third Lacy Decl.).

The Conservancy (and the district court) also failed to account for the whales' migration patterns. *See generally* 4-ER-605–11; 1-ER-4–45. As the BiOp explains, the whales generally live in inland waters in the summer and coastal waters in the winter. 5-ER-966–67; 6-ER-1191–92. Had the Conservancy picked numbers fairly representing the time and place where prey and whales intersect, it would have represented that the entire Southeast Alaska fishery (not just trollers) reduces prey in inland waters in the summer by approximately 1.8% (with a range of 1.1 to 2.5%). 2-ER-304; 5-ER-1126–27; 6-ER-1192. And when SRKW move to coastal waters in the winter, the data from the 2019 BiOp show that the entire Southeast Alaska fishery reduces SRKW prey availability by only about 0.5% (with a range of 0.2 to 1.1%). 2-ER-304; 5-ER-1126–27; 6-ER-1192. Because the vacatur order would have enjoined only part of the fishery (the commercial trollers in winter and summer), the reduction in increased prey availability expected would be even less.

Simply put, the historical data from the 2019 BiOp does not suggest that the Southeast Alaska Chinook troll fishery reduces prey availability for SRKW by 5%, and the district court erred in relying on the Conservancy's graph representing that it does. 1-ER-4, 34.

Second, the district court erred in assuming that increased prey availability linearly correlates to increased benefits to SRKW—i.e., that more prey availability equals more population stability. 1-ER-4, 34. As the agency has explained, the many factors harming the whales act in concert with each other. 2-ER-309. In the BiOP, NMFS advised against "implicating any particular fishery." 5-ER-972. Since the BiOp was issued, the Pacific Fishery Management Council formed a workgroup to better evaluate the effects of Council-managed fisheries on the endangered whales and determined that there is *no* detectable relationship between Chinook abundance and SRKW demographic rates. 2-ER-303. The sample size of the SRKW is too small, the relationships are not constant over time, and critically, "multiple factors, not just prey abundance," may be impacting the whales. 2-ER-303. In other words, more prey availability does not mean population stability and growth. The district court erred in simplistically assuming that it does. 1-ER-4, 34.

Third, the district court failed to consider that increased prey availability could just feed other predators rather than help the endangered whales. Using a historical-data based model to predict how closing the fishery would increase prey for SRKW overestimates the potential benefit to the endangered whales because the number of competing predators has grown since the model's data were compiled. 2-ER-242–43. As mature Chinook swim back towards their spawning grounds, they are consumed by many other predators including salmon sharks,

pinnipeds, Alaska Resident killer whales, and Northern Resident killer whales. 2-ER-242–43. In particular, the population of Northern Resident killer whales is burgeoning and they have a high degree of dietary overlap with SRKW. 2-ER-242–43; *see also* 8-ER-1775–76. In recent studies, when prey abundance has increased, the Northern Resident killer whales—not the SRKW—have seen improvement. 2-ER-243. The district court did not address this evidence. *See generally* 1-ER-4–45.

Fourth, the district court ignored the likelihood that an increase of Chinook abundance from closing the Alaska fishery might be offset by other fisheries increasing their own harvest in response. *See generally* 1-ER-4–45. Before Chinook can reach the SRKW, they are subject to capture by other commercial, recreational, and subsistence fisheries off the coasts of Southeast Alaska, British Columbia, and Washington. 2-ER-242–43; 8-ER-1794–95. Rather than allowing more fish to return to SRKW feeding grounds, the district court decision gives these other fisheries more opportunity to catch more Chinook. 2-ER-243; 8-ER-1795.[7] The Conservancy's assumptions and the district court's findings simply do not consider that foregone Alaska harvest will "likely lead to improved catches in

---

[7]     Only a few fisheries, including Southeast Alaska, have limits set before the season opens. 5-ER-892; 8-ER-1794–95. The other fisheries adjust their harvests depending on in-season data—that is, higher fish counts can lead to higher harvests. 8-ER-1795; *see also* 5-ER-895–97.

Canadian and Washington fisheries," rather than more prey availability for the SRKW. 2-ER-243. The district court did not restrict any other fisheries, instead placing the entire burden of conservation on Alaska's summer and winter Chinook troll fisheries and leaving other fisheries free to cancel out the potential minor benefit to the SRKW.

Fifth, the district court did not assess the meaningfulness of providing what is only—at best—a short-term increase of prey availability effective only until the agency reissues a new BiOp. *See generally* 1-ER-4–45. As discussed below, NMFS will likely issue the same ITS on remand. *See infra* Argument Section III. Even if it were not error to credit the Conservancy's unsupportable assertion that *continued* closure of the Southeast Alaska troll fishery could create 5% more prey for SRKW and would maintain a "long-term [] population growth rate [of] 0.00%," no one, not even the Conservancy, asserts that closing the fishery just until NMFS reissues an ITS with the same harvest numbers will create a meaningful long-term benefit to the endangered whales. 4-ER-609 (Third Lacy Decl.) Conversely, even a single season closure will devastate Southeast Alaska. This situation epitomizes how vacatur would lead to "disruptive consequences" (devastation to Southeast Alaska) under an "interim change" (vacatur of the ITS) that would then "itself be changed" (reissuance of the ITS). *Regan*, 56 F.4th at 663.

For all these reasons, the district court clearly erred in finding that its vacatur order would *meaningfully* improve prey availability to SRKW as well as SRKW population stability and growth. 1-ER-4, 34. The data show that the entire Southeast Alaska fishery reduces prey availability for the endangered whales by an average of 0.5% in the winter in coastal waters and 1.8% in the summer in inland waters (in places when and whales are typically present) and that the trollers' impact as a part of that fishery is even less. 2-ER-304; 5-ER-1126–27; 6-ER-1192. The district court erred in relying on the Conservancy's flawed analysis instead of taking a critical look at the data.

### C. Shutting down Southeast Alaska's Chinook troll fishery is not in the nation's interest.

Congress funds the prey increase program every year with an understanding that the program will both increase prey abundance for the SRKW and enable the Southeast Alaska fishery to operate under the terms of the 2019 Treaty negotiations. 2-ER-137. Congress has thus already weighed the equities and has spoken. The district court abused its discretion in imposing a remedy that overrides Congress's choice.

The district court also abused its discretion in imposing a remedy that undermines the United States' Treaty negotiations with Canada. This is not a typical ESA case because it involves Congress's complementary objectives under the Pacific Salmon Treaty. Enjoining the Alaska fishery would frustrate the

46

Treaty's principle of fairly sharing salmon with Canada. Canadian Individual Stock-Based Management fisheries have broad latitude under the Treaty to increase their take of Chinook in response to increased abundance resulting from Alaska's foregone harvest. 8-ER-1795; 7-ER-1675. Vacating the ITS might therefore do little to decrease overall harvest (because Canada can take more) while also undermining the harvest sharing arrangement that the United States negotiated in 2019. And vacatur would continue to impact Alaska's fishery even once a new BiOp is in place because Alaska's Treaty harvest limits are—per the 2019 negotiations—set based on fishing data from the previous winter season. 7-ER-1676; 5-ER-892. If the winter fishery is closed, Alaska does not have the data required to set its Treaty harvest limits for the following year. 7-ER-1676; 5-ER-892. Instead, Alaska would be subjected to lower harvest levels for all of its Treaty fisheries the following year, further compromising Congressional intent that the United States receive its fair share of salmon. 2-ER-1676.

Given the undisputed harms to Southeast Alaska, the absence of meaningful benefit to the SRKW, and Congress's intent to keep the fishery open and fairly share salmon with Canada, the equities demand remand without vacatur. *Regan*, 56 F.4th at 663. The equities are determinative here, so this Court need not get to the second prong of test. *See id.* at 663-69 (remanding without vacatur despite the court's categorizing the errors as "serious" and despite the court's "serious concern

that EPA continues to flout the ESA"); *Cal. Cmtys. Against Toxics*, 688 F.3d at 993–95 (remanding without vacatur based on equities despite "substantive" errors). But if this Court does consider the "seriousness" of NMFS's violations, that prong also weighs in favor of remand without vacatur.

### III. The agency will likely issue the same ITS on remand, which also favors remand without vacatur.

The other part of the two-factor test considers the seriousness of the agency's errors, meaning whether the agency is likely to issue the same decision on remand. *Regan*, 56 F.4th at 663–64. An error is not serious when "the agency would likely be able to offer better reasoning" or when "by complying with procedural rules, it could adopt the same rule on remand." *Id.* Conversely, an error is serious when "such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Id.* To determine whether an agency would adopt the same rule, courts consider, among other things, whether the agency has substantially complied with the law. *Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 929 (9th Cir. 2020).

Here, the district court found no *direct* flaws in NMFS's analysis regarding how the Alaska fishery itself affects SRKW and ESA-listed salmon. *See generally* 1-ER-4–45. Rather, the district court found *indirect* flaws in the analysis—it saw problems with the agency's approval of the prey increase program, which is meant

to mitigate against the impact of multiple Treaty fisheries, including Alaska's. 1-ER-4, 32–33.

The main flaw the district court found was that the prey increase program was (in 2019) not yet certain and not yet site-specific, so NMFS should not have relied on it in issuing an ITS. 1-ER-4, 30–39. But since 2019, the program has become certain and site-specific. Congress annually funds the prey increase program., 4-ER-660, 663; 2-ER-ER-255–57, 275; *see also* 2-ER-99.[8] The agency has made site-specific determinations in choosing hatcheries to produce additional prey for SRKW. 2-ER-275–77. And the number of smolts (young Chinook) released annually is meeting the agency's expectations. 2-ER-275, 285 (more than 11 million smolts released in 2020, nearly 14 million released in 2021, and more than 19 million released in 2022). Even if the program produced only half the smolts anticipated in the 2019 BiOp and increased prey by 2 to 2.5% (rather than 4 to 5%), that would still greatly exceed the prey reduction caused by the *entire* Southeast Alaska fishery (approximately 0.5% during winter in coastal waters and 1.8% during summer in inland waters). 2-ER-304; *see also* 2-ER-245–46.

The main flaw the district court identified—that the prey increase program was not yet site-specific and not yet certain in 2019—could not justify vacating the

---

[8]     It has also fully funded the other conservation programs for Puget Sound salmon. 2-ER-255–57.

ITS in 2023, because by 2023, the program *was* site-specific and certain and had been fully funded every year. 4-ER-660–61, 663; 2-ER-255–57, 275; *see also* 2-ER-99. Yet the district court concluded in 2023 that this flaw was serious enough to warrant vacatur. 1-ER-4, 32–33. This was legal error. Indeed, the district court all but acknowledged that the main flaw supporting its vacatur no longer existed by finding elsewhere in its order that the prey increase program "though previously uncertain and indefinite in the 2019 SEAK BiOp—has also now been funded and begun providing prey the past three years." 1-ER-4, 36.

As for the other flaws the district court found, they have since been substantially corrected too. The district court found that the ESA and NEPA required the agency to assess how the prey increase program would affect ESA-listed salmon. 1-ER-4, 33. Since then, the agency has done this. The risks to wild fish from hatcheries is best analyzed at site-specific levels that consider where the hatchery fish are released. 2-ER-277. In 2019, NMFS had not definitively chosen which hatcheries it would use to produce more prey for the SRKW. 4-ER-661. But the agency has since chosen hatcheries for its prey increase program. 4-ER-662–63; 2-ER-275–77. And NMFS has undergone ESA and NEPA analyses regarding each site-specific hatchery within the prey increase program, including how those programs affect ESA-listed salmon, and it has not terminated the program. 4-ER-661–62 (discussing how agency picks hatchery programs that will not jeopardize

ESA-listed species); 2-ER-275–76 (discussing agency's conducting ESA and NEPA review for using hatcheries to produce more fish). NMFS is using these analyses, which consider cumulative impacts, as it prepares its programmatic NEPA analysis and new BiOp, expected to be issued in the fall of 2024. 2-ER-145–46, 276–77. The agency has thus substantially complied with both the procedural and substantive aspects of the ESA and NEPA.

This case is thus similar to *National Family Farm Coalition v. U.S. Environmental Protection Agency*, in which the EPA failed to fully consider the risks of a pesticide to monarch butterflies. 966 F.3d 893, 916–17 (9th Cir. 2020). There, the EPA considered how a pesticide would affect milkweed *near* farmers' fields, but it did not consider how the pesticide would affect milkweed *in* those fields. *Id.* This Court found the error not "serious" in light of the EPA's full compliance with the ESA and substantial compliance with another applicable environmental statute. *Id.* The agency's error here is similarly not serious enough to warrant vacatur.

Or consider *Center for Food Safety v. Regan*, in which the EPA repeatedly "flout[ed]" the ESA's consultation requirement and violated another environmental statute's notice-and-comment provisions when it registered a pesticide. 56 F.4th at 656–64. This Court called the EPA's violation of the ESA "serious." *Id.* at 664. Despite that appellation, this Court concluded that vacatur was unwarranted

51

because the "seriousness" prong of the analysis gets at whether the agency could "likely adopt the same . . . decision on remand." *Id.* at 663. And this Court concluded it could. *Id.* at 663–64. This Court relied on the fact that the EPA did not register the pesticide "in total disregard of its potential harm." *Id.* at 664. So too here. One criterion NMFS uses in deciding which hatcheries to fund for the prey increase program is that increased production cannot jeopardize the survival and recovery of ESA-listed salmonids. 2-ER-275–77. And NMFS reviews increased production under the ESA and NEPA, as applicable. 2-ER-275–76. The agency is thus not executing the prey increase program "in total disregard of its potential harm" to ESA-listed salmon. *See Regan*, 56 F.4th at 664. And because the problems the district court found with the ITS relate to the prey increase program, NMFS will likely issue the same ITS on remand.

The district court committed legal error when it ignored the agency's environmental analyses of each hatchery used in the prey increase program and cursorily concluded that the agency had not demonstrated substantial compliance with NEPA and the ESA. 1-ER-4, 33. Considering Congress's actions over the past four years and the agency's analyses of site-specific hatchery programs being used to increase prey for SRKW, NMFS is likely to issue the same ITS on remand, albeit with "better reasoning." *See Regan*, 56 F.4th at 663.

The Conservancy speculates that NMFS might change its decision by further reducing harvest limits below those in the Pacific Salmon Treaty, but NMFS lacks authority to change the Treaty-established harvest limits via a BiOP. Harvest limits are set by the terms of the Pacific Salmon Treaty—not by NMFS in a BiOp. 7-ER-1618–8-ER-1765. Changes to Treaty harvest regimes require consensus among the U.S. Commissioners, one of whom represents Alaska. Pacific Salmon Treaty Act, P.L. 99-5, §3(a),(g), 99 Stat. 7 (1985).

Nor would there be reason for the agency to reduce harvest limits even if such authority existed. Alaska's effect on prey availability for the endangered whales is minor. The BiOp shows that the *entire* Southeast Alaska fishery (not just trollers) reduces prey availability for SRKW by an average of 0.5% in coastal waters in winter and by 1.8% in inland waters in summer. 2-ER-304; 5-ER-1126–27; 6-ER-1192. The 2019 BiOp also discussed that "the impact of reduced Chinook salmon harvest on future availability of Chinook salmon to Southern Residents is not clear and cautioned against overreliance on correlative studies or implicating any particular fishery." 5-ER-972. Since then, NMFS has reiterated that the Conservancy's asserted "relationship quantifying specific changes in reproduction or survival metrics from specific Chinook salmon abundances [is] outdated and not based on the best available science." 2-ER-302. Plus, Alaska already took a reduction of up to 7.5% to its Treaty harvest limits to support

SRKW and ESA-listed Chinook stocks. 5-ER-895; 6-ER-1191. And the prey increase program is already more than mitigating Alaska's minor impact on prey availability. 2-ER-245–46.

Because the prey increase program is now certain and site-specific and NMFS has substantially complied with the ESA and NEPA, the flaws the district court found are not serious enough to justify vacatur. The district court erred in vacating the ITS only to have the agency reissue it in the fall of 2024 with irreparable harm to Southeast Alaska (and no real benefit to the endangered whales) in the meantime.

## CONCLUSION

Alaska requests this Court reverse the district court's order partially vacating the ITS.

Dated: September 29, 2023.

TREG TAYLOR
ATTORNEY GENERAL

*/s/ Laura Wolff*
Laura Wolff
Alaska Bar No. 1411108

*Attorney for Appellant-Intervenor*
*State of Alaska*

## STATEMENT OF RELATED CASES

Undersigned counsel is unaware of any cases that are considered related within the meaning of Circuit Rule 28-2.

September 29, 2023      */s/ Laura Wolff*
                                     Laura Wolff

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 10,927 words, excluding the items exempted by FRAP 32(f), and thus complies with the word limit of Cir. R. 32-1. The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

September 29, 2023      */s/ Laura Wolff*
                                     Laura Wolff